IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| VERNARD BROOKS, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> COMMUNITY MEMORIAL HOSPITAL ) <br> OF MENOMONEE FALLS, INC. and ) <br> FROEDTERT HEALTH, INC ) <br> Defendant. ) <br> _____ ) | Civil Action No.17-cv-659 <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMAND |

NATURE OF THE ACTION

Plaintiff, VERNARD BROOKS ("Mr. Brooks"), brings this action pursuant to the Americans With Disabilities Act, as amended ("ADA") 42 U.S.C. §12101, et seq. and the Family Medical Leave Act ("FMLA"), 29 U.S.C. §2601 et seq. to remedy acts of employment discrimination, interference of rights and retaliation perpetrated against him by COMMUNITY MEMORIAL HOSPITAL OF MENOMONEE FALLS, INC. ("CMH") and FROEDTERT HEALTH, INC. ("Froedtert") (Collectively "Defendants")

JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, and 1343.

2. The Employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of Wisconsin.

PARTIES

3. Mr. Brooks is a citizen of the United States and a resident of Wisconsin. At all times relevant to this action, Mr. Brooks was a qualified individual with a disability

as defined by the ADA and was employed by Defendants until his employment was terminated on September 12, 2016.

4. At all relevant times, Defendant MCH has been incorporated in the State of Wisconsin with the Principal Office in Milwaukee, Wisconsin, and has been doing business in the State of Wisconsin, and, under information and belief, has continuously employs over three-hundred (300) people.

5. At all relevant times, Defendant Froedtert has been incorporated in the State of Wisconsin with the Principal Office in Milwaukee, Wisconsin, and has been doing business in the State of Wisconsin, and, under information and belief, has continuously employs over three-hundred (300) people

6. At all relevant times, Defendants have continuously been an employer engaged in an industry affecting commerce under Section 101(5) and 101(7) of the ADA and 29 CFR 825.104 (FMLA).

## ADMINISTRATIVE EXHAUSTION

7. Mr. Brooks has complied with all the administrative prerequisites to action under Section 706 of Title VII and the ADEA as required.

8. A Notice of Suit Rights was issued on February 9, 2017 for EEOC charge Number 443-2016-01623.

## FACTUAL ALLEGATIONS

9. Mr. Brooks became an Environmental Services Attendant for Defendants beginning December 2, 2013.

10. From his start date, through 2015, Mr. Brooks received a raise with every performance review and received bonuses on each period of eligibility.

11. In or about December of 2014, Mr. Brooks began using FMLA leave intermittently due to a condition in his foot that prevented him from standing or walking for long periods of time.

12. At that time, Mr. Brooks' supervisors, Dawn Matthews and Michael Klinter and his general manager, Jackie Cox, instructed Mr. Brooks not to come in on weekends or holidays because there would be no supervisors scheduled on those days.

13. Ms. Matthews, Mr. Klinter and Ms. Cox explained to him that because of his disability, Defendants' insurance policy required that a disabled or injured employee only appear to work when a supervisor was present.

14. Supervisors were never scheduled for weekends or holidays.

15. Mr. Brooks' name would regularly be included on Defendant's holiday schedule despite the fact that he would not be allowed to work on those days.

16. Through 2015, he was never disciplined for not appearing on a holiday, even if his name was on the holiday schedule.

17. Thereafter, anytime an absence or partial absence occurred that was related to his physical disability it was excused without question or incident.

18. When needed, Mr. Brooks would show up to work approximately thirty minutes to two hours after the usual start of his shift but rarely, if ever, missed entire shifts.

19. Mr. Brooks would do so anywhere from one to four times per week.

20. Mr. Klinter always responded positively to Mr. Brooks' use of leave and never required any specific form or timing of notice that FMLA would be used.

21. On or about October 21, 2015 Mr. Brooks presented Defendants with medically certified request for an accommodation for a position with reduced walking, standing, and lifting responsibilities and two to three days off per month for "flare-ups".

22. Three months later, Mr. Brooks met with his Supervisor, Michael Klinter and the CMH's Director of Human Resources, Kimberleigh Nash, and they agreed his disability could be accommodated by assigning him to operating rooms only.

23. Mr. Brooks continued his pattern of using intermittent leave while working in the operating rooms without incident.

24. By April of 2016, Mr. Klinter had been replaced as supervisor by Megan Barke.

25. In early April, Mr. Brooks received the shocking news that his sister was suffering from terminal cancer.

26. On or about April 20, 2016, Ms. Barke approached Mr. Brooks and pulled him into a meeting with her and the director of human resources at the time, to tell him that he could not take so much time off for intermittent leave because it did not match his medical certification.

27. Mr. Brooks explained that he had to take that much time off in order to perform his duties with his disability and that it had never been a problem in the past.

28. Mr. Brooks felt like he was being disciplined for something he had always been allowed to do and that Ms. Barke was specifically singling him out because he was the only one who needed these accommodations and intermittent leave.

29. Already under the stress of losing his sister, and knowing that he could not work without the ability to use intermittent leave he became very emotional and felt he could not continue his duties productively that day and left the worksite.

30. While the Human Resource director acknowledged Mr. Brooks grief over his sister, he and Ms. Barke still give Mr. Brooks the impression that his job was in jeopardy.

31. Despite his pattern of intermittent leave having been approved and accommodated for years, Mr. Brooks understood that he needed to update his medical certification for FMLA.

32. On or about May 11, 2016 Mr. Brooks presented a new Medical Certification for his intermittent FMLA requesting the ability to be up to one and a half hours late, for up to five times per week, which was granted.

33. Haley Coleman, the leave of absence case manager, emailed Mr. Brooks to indicate that, with the new certification, any prior FMLA absences would be covered.

34. After submitting the certification, it was clear to Mr. Brooks that Ms. Barke was unhappy that he was able to get medical certification for his use of intermittent leave, as she would be short or rude when he would call in for FMLA and would overtly scrutinize Mr. Brook's performance disproportionate to her scrutiny of others.

35. Ms. Barke's presence in the operating rooms became more frequent whenever Mr. Brooks was working.

36. On or about May 17, 2016, Mr. Brooks received a written warning from Ms. Barke outlining dates from April 11, 2016 through May 17, 2016 that Mr. Brooks

presumably failed to follow call in policies related to his FMLA leave despite her knowledge of his disability and intermittent FMLA certification.

37. This was the first time Mr. Brooks had ever been told that he was not following procedure properly relative to providing notice of his use of FMLA leave or need for accommodation despite years of being accommodated without issue.

38. The symptoms that required Mr. Brook's to use intermittent FMLA could present themselves at any time and had varying speeds of recovery.

39. As such, Mr. Brooks would not necessarily know if he would need to come in late until it was time to leave for work.

40. This was particularly discerning to Mr. Brooks as Ms. Barke had not raised the issue of notice when she gave him an oral warning on April 20, 2016 yet this write up included dates from before that date.

41. That same date, Ms. Barke also gave Mr. Brooks a second written warning for abandoning his shift on April 20, 2016.

42. Thus, six days after providing medical certification that confirmed his use of FMLA and need for accommodations, Mr. Brooks suddenly had two written warnings on his record.

43. An employee can have three written warnings before another violation results in termination.

44. This intense scrutiny of Mr. Brooks' attendance continued for the remainder of his employment.

45. In June of 2016, Mr. Brooks' sister passed away after only a few weeks of warning that she was likely to pass.

46. Mr. Brooks is aware of other employees of Defendants who had suffered deaths in their immediate family in the past.

47. Each time, including when Mr. Brooks called in, the employee was told to "take as much time as you need" and their absences would not be counted against them.

48. In his experience, bereavement leave was only needed when it was being requested in advance to attend a funeral.

49. Upon notifying Defendants of his sister's passing, he was told, "take as much time as you need." No conversation regarding bereavement leave took place at that time.

50. Mr. Brooks was largely responsible for his sister's estate and her funeral planning and took five days off for his own grief as well as making arrangements.

51. Only after he had taken five days off to deal with his grief was he told that was only allowed to use three days of bereavement leave despite his knowledge of other employees being granted more time without discipline.

52. Mr. Brooks was told that if he attended his sister's funeral he would be in violation of the Defendant's attendance policy.

53. On or about July 19, 2016, Mr. Brooks received his third written warning for not appearing for work on the day before and the day of his sister's funeral and was warned that any further occurrence before March 3 of 2017 may result in his termination.

54. Because he felt he was being singled out and not being accommodated, Mr. Brooks filed an EEOC charge for disability discrimination on or about July 28, 2016 (EEOC Charge No.: 443-2016-01422).

55. Around the same time, Mr. Brooks filed a complaint with the United States Department of Labor for violations of FMLA (Complaint # 1800388).

56. On Labor Day, September 5, 2016, a coworker of Mr. Brooks, Christine Green, received a call that she was on schedule to work that day even though she had made plans well in advance of that day to go on vacation.

57. Ms. Green changed her plans and went in to work after receiving the phone call.

58. When she arrived, Ms. Greene noted that two other employees were also on the holiday schedule, but not at work, including Mr. Brooks.

59. The next day, Ms. Green told Mr. Brooks what she experienced the day before.

60. Mr. Brooks finished his week of work without incident.

61. The following Monday, September 12, 2016, Mr. Brooks received his final corrective action notice stating that he was terminated for not appearing for work on September 5, 2017 even though he had been told never to work on holidays.

### Count One
### Violation of ADA
### (Employment Discrimination Based on Disability)

62. Mr. Brooks realleges and incorporates by reference the allegations contained in all preceding and all subsequent paragraphs of the Complaint as though fully set forth herein.

63. This claim is authorized and instituted pursuant to the provisions of the Americans with Disabilities Act, for relief based upon the unlawful employment practices of the above-named Defendant. Specifically, Mr. Brooks complains of Defendants'

violation of the ADA's prohibition against discrimination in employment based, in whole or in part, upon an employee's disability.

64. During his employment with Defendants, Mr. Brooks was a member of a class protected under the ADA. Defendants had notice of Mr. Brooks' disability or otherwise perceived Mr. Brooks to be disabled.

65. Mr. Brooks' disability was a motivating factor in creating the adverse employment actions against him as described herein.

66. Defendants discriminated against Mr. Brooks by disciplining him without warning for violations of policy that had previously been incorporated as part of his accommodations.

67. Every single one of the corrective actions described herein were done as a pretext to hide the true motivating discriminatory factor for the discipline.

68. As Mr. Brook's employment would not have ended but for reaching his fourth corrective action, each and every corrective action is responsible, in and of itself, for the ultimate outcome of employment termination.

69. Defendants further discriminated against Mr. Brooks by terminating his employment due to his disability, as well as his need, request and use of accommodations.

70. Defendants' acts and omission are the direct and proximate cause for the adverse employment actions against Mr. Brooks in violation of the ADA.

71. As a further direct and proximate result of Defendants' wrongful acts and omissions, Mr. Brooks sustained loss of earnings and earning capacity; loss of fringe and pension benefits; suffered mental anguish, physical and emotional distress; humiliation

and embarrassment; loss of professional reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of his choice

72. The intentional and discriminatory conduct of the Defendants complained of herein was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages, which will serve as an example and deterrent to Defendants and others who would commit similar illegal acts.

73. As Defendant's engaged in discriminatory employment practices with malice or with reckless indifference to Mr. Brooks' federally protected rights, Mr. Brooks is entitled to punitive/exemplary damages in addition to compensatory damages, attorney fees and other remedies available under the ADA.

## Count Two
## Violation of FMLA
### (Interference with rights under the Family Medical Leave Act)

74. Mr. Brooks realleges and incorporates by reference the allegations contained in all preceding and all subsequent paragraphs of the Complaint as though fully set forth herein.

75. Defendants are employers covered by the Family and Medical Leave Act pursuant to 29 USC 2601 et seq.

76. In or about December of 2014 through the remainder of his employment, Mr. Brooks was entitled to leave under the Family and Medical Leave Act, pursuant to 29 CFR §825.114.

77. Defendant's policy of requiring one hour notice for use of intermittent leave is a *per se* violation of Mr. Brook's FMLA rights as the symptoms related to his intermittent leave may not present itself prior to an hour before his shift begins.

78. Defendants engaged in prohibited conduct under the FMLA by interfering with, restraining or denying Mr. Brooks' rights provided under the Act.

79. Defendant's chilled the rights of Mr. Brooks under the Act by threatening to discipline, or disciplining the use or attempted use of FMLA with and/or without the opportunity to provide updated medical certifications.

80. Defendants' action interfered with Mr. Brooks' rights under the FMLA, including but not limited to the right to be to be free from threats and discipline for exercising his rights under the law.

81. Defendants' actions were intentional, with deliberate disregard for the rights and sensibilities of the Mr. Brooks.

82. As a direct and proximate result of Defendants' wrongful acts and omissions, Mr. Brooks sustained loss of earnings and earning capacity; loss of fringe and pension benefits; suffered mental anguish, physical and emotional distress; humiliation and embarrassment; loss of professional reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of his choice.

### Count Three
### Retaliation for Engaging in Protected Activity
### (ADA)

83. Mr. Brooks realleges and incorporates by reference the allegations contained in all preceding and all subsequent paragraphs of the Complaint as though fully set forth herein.

84. Mr. Brooks is and was, at all relevant times, a qualified individual with a disability, or was otherwise perceived as such.

85. Mr. Brooks made many requests for his condition to be accommodated, and he was accommodated for over two years.

86. Suddenly and without warning, Mr. Brooks was disciplined for his use of accommodations.

87. Mr. Brooks made various complaints to his direct supervisor and director of human resources that he was being treated unfairly because of his condition.

88. After the treatment worsened, Mr. Brooks filed a charge with the Equal Employment Opportunity Commission for disability discrimination.

89. Mr. Brooks also filed a complaint with the Department of Labor for violations of the FMLA.

90. A little over one month after the EEOC charge was filed, Mr. Brooks' employment was terminated.

91. Defendants attempted to hide their true intentions by alleging violations of policy that Mr. Brooks had previously been instructed to do, including not working on holidays even if he was scheduled.

92. As Mr. Brook's employment would not have ended but for reaching his fourth corrective action, each and every corrective action is responsible, in and of itself, for the ultimate outcome of employment termination.

93. The intentional and retaliatory conduct of Defendants complained of herein was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages, which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

94. As Defendants engaged in retaliatory employment practices with malice or with reckless indifference to Mr. Brooks' federally protected rights, Mr. Brooks is entitled to punitive/exemplary damages in addition to compensatory damages, attorney fees and other remedies available under the ADA.

## Count Four
## Retaliation for Engaging in Protected Activity
## (FMLA)

95. Mr. Brooks realleges and incorporates by reference the allegations contained in all preceding and all subsequent paragraphs of the Complaint as though fully set forth herein.

96. Mr. Brooks was, at all relevant times, certified for intermittent FMLA leave.

97. Mr. Brooks use intermittent FMLA leave for over two years without issue.

98. Suddenly and without warning, Mr. Brooks was disciplined for his use of intermittent leave.

99. Mr. Brooks made various complaints to his direct supervisor and director of human resources that he was being treated unfairly because of his FMLA leave.

100. Mr. Brooks also filed a complaint with the Department of Labor for violations of the FMLA.

101. A little over one month after the FMLA complaint was filed, Mr. Brooks' employment was terminated.

102. Defendants attempted to hide their true intentions by alleging violations of policy that Mr. Brooks had previously been instructed to do, including not working on holidays even if he was scheduled.

103. As Mr. Brook's employment would not have ended but for reaching his fourth corrective action, each and every corrective action is responsible, in and of itself, for the ultimate outcome of employment termination.

104. The intentional and retaliatory conduct of Defendants complained of herein was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of liquidated damages.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

PRAYER FOR RELIEF

WHEREFORE, Plaintiff VERNARD BROOKS respectfully requests that this Court:

A. Order Defendants COMMUNITY MEMORIAL HOSPITAL OF MENOMONEE FALLS, INC. and FROEDTERT HEALTH, INC. to make whole M. Brooks, by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to reinstatement or front pay in lieu of reinstatement.

B. Order Defendants COMMUNITY MEMORIAL HOSPITAL OF MENOMONEE FALLS, INC. and FROEDTERT HEALTH, INC. to make whole Mr. Brooks, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including, but not limited to job search expenses, effects on credit history, debt, increase in insurance costs and other incidental expenses, in amounts to be determined at trial.

C. Order Defendants COMMUNITY MEMORIAL HOSPITAL OF MENOMONEE FALLS, INC. and FROEDTERT HEALTH, INC. to make whole Mr. Brooks by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained above, including, but not limited to emotional pain, suffering, inconvenience, humiliation and mental anguish, in amounts to be determined at trial.

//

//

D. Order Defendants COMMUNITY MEMORIAL HOSPITAL OF MENOMONEE FALLS, INC. and FROEDTERT HEALTH, INC. to pay Mr. Brooks liquidated damages pursuant to the FMLA.

E. Order Defendants COMMUNITY MEMORIAL HOSPITAL OF MENOMONEE FALLS, INC. and FROEDTERT HEALTH, INC. to pay Mr. Brooks punitive damages for its malicious and reckless conduct, as described above, in amounts to be determined at trial.

F. Award Mr. Brooks his reasonable attorney's fees and costs, including but not limited to expert witness fees as provided for under the ADA.

G. Award Mr. Brooks with interest on any awards at the highest rate allowed by law; and

H. Grant such further relief as the Court deems necessary and proper.

## JURY TRIAL DEMAND

Plaintiff, VERNARD BROOKS, requests a jury trial on all matters as to which he is entitled by law.

LAW OFFICE OF ADAM M. KENT

Dated: May 8, 2017              s/Adam M. Kent
                                Adam M. Kent
                                Attorney for Plaintiff

                                7670 N. Port Washington Rd
                                Suite 105
                                Milwaukee, WI 53217
                                (619) 892-8422
                                Attorney@adamkentlegal.com
                                WI Bar No.: 1099634