# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

VERNARD BROOKS,

                  **Plaintiff,**

       **v.**                             **Case No. 17-CV-659**

COMMUNITY MEMORIAL HOSPITAL
OF MENOMONEE FALLS, INC., et al.,

                  **Defendants.**

---

## DECISION AND ORDER

---

### Introduction

On September 12, 2016, Vernard Brooks was terminated from his position as an environmental services attendant with Froedtert Health, Inc., a regional health system that includes Community Memorial Hospital of Menomonee Falls, Inc.. Brooks filed this lawsuit on May 8, 2017, alleging interference with his rights under the Family and Medical Leave Act (FMLA), discrimination in violation of the Americans with Disabilities Act (ADA), and retaliation for the exercise of his rights under the FMLA and ADA. (ECF No. 1.) All parties consented to the jurisdiction of a magistrate judge. (ECF Nos. 4 and 8.)

Defendants have filed a motion for summary judgment on all counts. (ECF No. 16.) In support of their motion the defendants rely on a number of exhibits that are offered as attachments to an unsworn "declaration" of one of their attorneys, Doris Brosnan. However, the Brosnan declaration does not comply with 28 U.S.C. § 1746. The declaration begins like an affidavit, stating "Doris E. Brosnan, being duly sworn on oath, states as follows: …" But the statement is not actually submitted under oath; it is not notarized and it lacks any sort of jurat or seal. (ECF No. 19 at 1.) And because it is missing the statutorily required statement, "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)[,]" 28 U.S.C. § 1746(2), it is not an unsworn declaration.

In opposing the motion Brooks relies on a number of exhibits that are offered as attachments to what purports to be an affidavit of his lawyer, Adam Kent. But the Kent affidavit contains no jurat or seal and is not notarized. (ECF No. 23.)

Ordinarily, the court would be compelled to disregard the Brosnan declaration and the Kent affidavit and, consequently, all the exhibits each purports to authenticate. However, the Brosnan declaration and the Kent affidavit each were submitted for the limited purpose of submitting documents, the authenticity of which no one disputes. In the absence of any objection to the authenticity of any of the attached exhibits, the court will accept them as evidence for purposes of considering the summary judgment

motion despite the parties' noncompliance with the requirements for affidavits and unsworn declarations.

However, the affidavits of Jacqueline Cox (ECF No. 26) and plaintiff Brooks (ECF No. 24), submitted by Brooks in opposition to the defendants' motion, are another matter. Like the Kent affidavit, neither is notarized. The Brooks affidavit lacks any jurat or seal. The Cox affidavit contains a form jurat, but aside from a "2" in the space for the day, the jurat is blank, without a name or signature of a notary or details as to the notary's commission. Nor is there a seal. Unlike the Kent affidavit, both the Cox and the Brooks affidavits set forth evidentiary facts that Brooks relies on, at least in part, in opposing the defendants' motion.

An affidavit must be "sworn to before someone who is authorized to administer an oath." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). For purposes of summary judgment, "unsworn documents purporting to be affidavits may be rejected." *Id.* The defects in the Cox and Brooks affidavits are not mere technicalities that the court may overlook. There is no indication that the affidavits were sworn to before a notary, nor do they comply with the requirements for an unsworn declaration under 28 U.S.C. § 1746. *Cf. Pfeil*, 757 F.2d at 859 (concluding the court erred in rejecting affidavit because it lacked notarial seal when jurat indicated it was nonetheless sworn to before notary and otherwise complied with 28 U.S.C. § 1746). In short, there is no reason to believe that the

penalties of perjury would apply to any false statement contained in the two documents. Therefore, the court finds it cannot consider these purported affidavits.

## Facts

Defendant Froedtert Health, Inc. is a regional health system that includes defendant Community Memorial Hospital of Menomonee Falls, Inc. (ECF No. 22, ¶ 1.) Brooks was hired by Froedtert in December 2013 as an Environmental Services Attendant ("EVS Attendant"). (ECF No. 1, ¶ 9.) EVS Attendants may be required to clean patient rooms, clinics, offices, and floors, remove trash, answer calls for beds, and clean up spills. (ECF No. 22, ¶ 27.)

Froedtert has a number of personnel policies. Among them are a Staff Attendance Policy (ECF No. 19-1), a Corrective Action Policy (ECF No. 19-2), a Staff Appeal Policy (ECF No. 19-3), a Leave of Absence and Return to Work Policy (ECF No. 19-4), a Bereavement Policy (ECF No. 19-5), an EVS Attendance and Tardiness Policy (ECF No. 19-6), and an EVS Call-In Policy (ECF No. 19-7.) Brooks disputes that the policies are applied equally at all times and to all employees. (ECF No. 22, ¶¶ 2-3.)

The Staff Attendance Policy states that Froedtert staff will "[a]rrive at work on time" and "[w]ork their full shift as scheduled". (ECF No. 19-1.) "[E]xcessive absenteeism and tardiness will not be tolerated." (*Id*.) "The corrective action process will begin when a staff member incurs five (5) occurrences in a rolling twelve month period." (*Id*.) An "occurrence" is any unscheduled time off and is defined as any of the

following: two instances of tardiness, missing more than 25 percent of a shift, missing part of a shift because of leaving early, an unscheduled absence that results in missing from one to five consecutive days of scheduled work, and missing work for more than five consecutively-scheduled work days. (*Id*.)

According to the Corrective Action Policy, corrective action normally will consist of written warnings for the first three occurrences, with a fourth occurrence resulting in discharge. (ECF No. 19-2.) According to the so-called "EVS Call-In Policy," EVS staff are to call in if "Sick, Late, Etc." by calling the shift supervisor. (ECF No. 19-7.) If the shift supervisor is unavailable, the employee is to call in and speak with someone on the EVS team to let them know that he is not coming in or that he is going to be late. (*Id*.) The EVS Attendance and Tardiness Policy requires that, for unscheduled time off, EVS staff "must call in a minimum of one hour prior to the start of their shift." (ECF No. 19-6.)

Finally, Froedtert's "Leave of Absence and Return to Work" Policy provides "guidelines for absence away from the job when necessary due to serious medical conditions and family leave under the federal Family and Medical Leave Act (federal FMLA) and Wisconsin Family and Medical Leave Act (WFMLA), as an accommodation for a disability, and to provide return to work guidelines for the staff member." (ECF No. 19-4.) Under that policy, for "unforeseeable leave" a staff member "must provide notice of absence pursuant to the departmental notification procedure as soon as practicable." (*Id*.)

When Brooks began working at Froedtert his general manager was Jacqueline Cox. (ECF No. 22, ¶ 29.) In May 2014 Brooks requested that Cox assign him permanently to the operating room. (ECF No. 22, ¶ 30.) Cox granted his request. (*Id*.)

Approximately a year later, Brooks applied for and was granted FMLA leave from April 30, 2015, through May 25, 2015, due to a foot condition (post tibial tendinitis/left posterior tibial tendon dysfunction stage II and Gastrocnemius/Achilles contracture). (ECF No. 22, ¶¶ 39, 44.) Among other things, Brooks's foot condition limited his ability to stand and walk for long periods of time. (*Id*., ¶ 40.) When Brooks returned from his leave of absence, his physician submitted a Certificate of Return to Work requesting an accommodation of "limited walking – able to walk up to 4 hours in an 8 hour shift …" as well as 2 to 3 days off per month due to pain flare up. (ECF No. 22, ¶ 45.)

Upon his return to work Brooks had a meeting with Cox in which they discussed his accommodations. (ECF No. 22, ¶ 47.) Brooks discussed his desire to stay in the operating room but was told he was going back to attendant duties because of staffing issues. (*Id*.) Froedtert alleges that the operating room position required Brooks to stand on his feet the entire shift, while Brooks contends that he could work in the operating room even with the recommended accommodations. (ECF No. 22, ¶¶ 48, 50.) Brooks and Cox signed a Temporary Accommodation Agreement that established a work

assignment for Brooks in which he was to work "2 hours dietary, 2 hours laundry (sit), 2 hours dietary, 2 hours laundry." (ECF No. 19-10.)

Brooks was additionally granted intermittent FMLA leave due to his foot condition and was allowed to be off work 2-3 days per month. (ECF No. 22, ¶ 51.) Froedtert also allowed Brooks to use FMLA leave to be tardy for his shifts. (*Id.*, ¶ 52.) Brooks's FMLA leave was eventually extended to allow him to call in late 4 to 5 times a week, and he began calling in late 4 to 5 days per week. (*Id.*, ¶¶ 51, 53.) Brooks never asked for any further accommodation for his foot condition. (*Id.*, ¶ 62.) Brooks was always given any time off that he needed for his foot condition. (*Id.*, ¶ 63.)

Defendants state that, although Brooks was allowed to use his FMLA leave to be tardy for his shifts, he was still required to follow the call-in procedure and notify his supervisor or someone else in the EVS department at least one hour before his shift was to start to let them know that he would be late. (ECF No. 22, ¶ 52.) Brooks states that he complied with the policy set forth in the Leave of Absence and Return to Work Policy that he call in "as soon as practicable." (*Id.*)

On November 21, 2015, Michael Klinter emailed Brooks to inform him that he had punched in late on November 17, 18, 19, and 20. (*Id.*, ¶ 65.) Klinter sent similar emails to other EVS employees who punched in late. (*Id.*, ¶ 66.)

Cox left Froedtert in December 2015. (ECF No. 22, ¶ 31.) Brooks then began reporting to Klinter. (*Id.*, ¶ 32.) Brooks asked for and was granted reassignment to the

operating room by Klinter. (*Id.*, ¶¶ 56-57.) In March 2016 Megan Barke became Brooks's direct supervisor. (*Id.*, ¶ 33.) Barke was unaware that Brooks needed any accommodations for his foot condition other than his need for time off. (*Id.*, ¶ 64.)

On or about April 20, 2016, Barke met with Brooks. The purpose of the meeting "was because [Brooks] began showing up tardy more than his certification allowed and warned that this could result in a corrective action under the attendance policy for too many occurrences." (ECF No. 29, ¶ 16.) During the meeting Brooks was asked whether his medical condition prevented him from calling in at least one hour before the start of a shift. (ECF No. 22, ¶ 75.) Brooks stated that he could not know within an hour of his shift when he was going to have a "flare up" of his foot condition. (*Id.*, ¶ 76.) Moreover, Brooks had recently learned that his sister had been diagnosed with Stage 4 cancer. (*Id.*, ¶ 81.) He was feeling "depressed and hurt" (*id.*, ¶ 83), stated that he was concerned with his sister dying and having a "write up at the same time" (*id.*, ¶ 84), and thus walked off of the job (*id.*, ¶¶ 80-84).

Froedtert subsequently reached out to Brooks's physician regarding his intermittent leave of absence for "flare-ups of his serious health condition," describing that Brooks is "currently calling in up to 7 days per week and states he is able to call in late to work." (ECF No. 19-15 at 2.) On May 11, 2016, Brooks's physician certified that Brooks could be tardy up to one and a half hours for five shifts a week. (*Id.* at 11-12.)

On May 17, 2016, Brooks received a first written warning for calling in late on 27 occasions between April 11, 2016 and May 17, 1016, to notify his leader and department that he would be either tardy or absent. (ECF No. 22, ¶ 69.) Brooks received a second written warning at the same time for walking off the job on April 20, 2016. (ECF No. 22, ¶ 80.) Thereafter, Brooks began following the call-in procedure for his tardies and absences. (*Id.*, ¶ 79.)

After his sister died, Brooks took three days off of work for bereavement leave during the week of June 6, 2016. (ECF No. 22, ¶ 89.) Froedtert's Bereavement Policy states that staff is granted a maximum of three scheduled work days to observe a period of bereavement when having suffered the loss of a sister. (ECF No. 19-5 at 2.) The policy further provides that under "special circumstances" a department manager may approve additional days off. (*Id.*) On Monday, June 13, Brooks called in and stated that he would not be at work that day or the next (ECF No. 22, ¶ 90) because "he needed to take care of things for the funeral on Tuesday" (ECF No. 19-17 at 2). As a result, he missed work those two additional days. (ECF No. 22, ¶ 90.) On July 19, 2016, Brooks received a third written warning for two unexcused absences on June 13 and 14, 2016. (ECF No. 19-17 at 2.)

On August 22, 2016, Brooks filed a charge of discrimination with the Wisconsin Equal Rights Division, alleging that he had been "discriminated against on the basis of disability when [he] was denied a reasonable accommodation and disciplined"—

apparently in connection with the warning arising out of his bereavement time off. (ECF No. 23-20.) That same month Karl Schultz, Director of Operations—Community Hospital Division at Froedtert, communicated that Barke was to be "VERY tight with [Brooks] on Call-ins." (ECF No. 29, ¶ 62.)

On September 5, 2016, Labor Day, Brooks was a "no call/no show" for a shift he was scheduled to work. (ECF No. 22, ¶ 97.) Brooks contends that he did not know he had to work that day due to a prior discussion with Cox in which she told him that he would never have to work holidays because no supervisor would be present to potentially accommodate his disability. (ECF No. 22, ¶ 98.) However, Brooks was scheduled to work Christmas 2015 and called in sick that day. (ECF No. 22, ¶ 103.) Because Brooks had received three written warnings in the previous twelve months, his employment was terminated on September 12, 2016. (ECF No. 19-19.)

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law'" and "'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The burden on the moving party may be

discharged by demonstrating 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## Analysis

The complaint contains four counts: a violation of the FMLA by interfering with Brooks's rights under the FMLA; a violation of the ADA for employment discrimination based on disability; retaliation for engaging in activity protected under the ADA; and retaliation for engaging in activity protected under the FMLA. The defendants seek summary judgment on all four counts.

For purposes of the present motion, the court finds it helpful to note that Brooks's claims fall into two broad categories. First, there are Brooks's claims that the defendants unlawfully disciplined him for not calling in at least an hour before the start of his shifts. According to Brooks, the defendants' policy requiring that he call in at least an hour before he was scheduled to work if he was going to be late interfered with his rights under the FMLA. It also violated the ADA because the defendants did not reasonably accommodate his disability.

Second, there are what might be characterized more broadly as substantive discrimination claims. Brooks alleges that he suffered adverse employment actions

(discipline and termination) because of animus regarding his disability and his FMLA leave. In the context of the FMLA, this sort of claim is characterized as one of "retaliation." Such a claim under the ADA is generally referred to as "disparate treatment" (although Brooks refers to it in his complaint as one of retaliation).

**Enforcement of the One-Hour Call-In Policy**

### FMLA Interference

In order to establish a claim under the FMLA Brooks must show that: (1) he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled. *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). Termination of employment can constitute interference. *See Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). "However, an employee may be fired for poor performance when []he would have been fired for such performance even absent h[is] leave." *Kohls v. Beverly Enter. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001).

Froedtert does not dispute that it is subject to the FMLA or that Brooks was permitted to use FMLA leave to come in late when his medical condition necessitated it. (ECF No. 17 at 8.) As a general matter, there is nothing improper about requiring an employee entitled to FMLA leave to follow "usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R.

§ 825.302(d); *see also* § 825.303(c) (addressing compliance with employer policy when need for leave is not foreseeable). According to Froedtert, its one-hour-in-advance call-in policy fits within this regulation. As such, it was permitted to discipline Brooks for not complying with it.

However, "[w]hen the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). Apparently believing that it supports their position, the defendants quote an opinion letter from the Department of Labor's Wage and Hour Division that discusses 29 C.F.R. § 825.303(a). The letter states, "where an employer's usual and customary notice and procedural requirements for requesting leave are consistent with what is practicable given the particular circumstances of the employee's need for leave, the employer's notice requirements can be enforced." Opinion Letter Family Medical Leave Act (FMLA), FMLA2009-1-A (Jan. 6, 2009), 2009 WL 1286146, at *3. But the defendants brush past the qualifying language—that usual notice procedures may be enforced only if they "are consistent with what is practicable given the particular circumstances of the employee's need for leave."

Thus, if the particular circumstances of the need for leave do not arise until after the employer's deadline for providing notice, it is not "practicable given the particular circumstances of the employee's need for leave" to require the employee to comply with

the employer's notice deadline. A one-hour-in-advance call-in policy that disciplines employees who cannot, due the circumstances necessitating the leave request, provide notice of their need for FMLA leave at least one hour before the start of their shift violates the FMLA.

Brooks contends he provided notice as soon as he could. He did not know when his foot condition would "flare up," which sometimes happened less than an hour before he was scheduled to start work. A reasonable finder of fact could conclude that, by applying and disciplining Brooks for violating the general one-hour-in-advance call-in policy, the defendants violated the FMLA and interfered with Brooks's rights under the act.

However, a dispute of material fact exists as to whether on each day he was late Brooks called in "as soon as practicable." The defendants make much of Brooks's supposed admission during his deposition that his foot did not prevent him from calling in at least an hour in advance of his shift. (*See* ECF No. 19-23 at 123.) However, his testimony can be understood as Brooks merely acknowledging that foot pain did not prevent him from dialing a phone. Brooks did not concede that he always knew more than an hour before his scheduled shift that his foot would flare up and prevent him from arriving on time.

The fact that Brooks was able to comply with the call-in procedure after he received a written warning is strong circumstantial evidence that Brooks had not been

calling in as soon as practicable, as is the fact that, after Froedtert requested it, he failed to provide a note from his physician that he was unable to timely call in. But these are conflicts the court cannot resolve on summary judgment; there remains a dispute of material fact for the jury. *See Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997).

### Failure to Accommodate Under the ADA

"'Discrimination,' [under the ADA] includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee' unless the employer 'can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (quoting 42 U.S.C. § 12112(b)(5)(A)). Brooks argues that the one-hour-in-advance call-in policy violated the ADA because the defendants applied it to him without consideration of his disability. (ECF No. 21 at 16-19.)

"In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). For purposes of the present motion, the dispute relates to the third element: whether the defendants failed to reasonably accommodate Brooks's disability. "In the general sense, 'an accommodation

is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.'" *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (quoting 29 C.F.R. pt. 1630 app. § 1630.2(o)).

The defendants have failed to show they are entitled to summary judgment on this claim. The fact that Brooks apparently never explicitly asked that he be excused from the one-hour-in-advance call-in policy as an accommodation for his disability (*see* ECF No. 17 at 25) does not entitle the defendants to summary judgment. "The employer has at least some responsibility in determining the necessary accommodation." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). "[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Brooks contends that when he "complained in his first disciplinary meeting [on April 20, 2016] that he could not know within an hour of his shift when he was going to have a 'flare up' that should have triggered an interactive process to determine whether or not Defendant could accommodate his disability by not requiring him to call in an hour before his shift." (ECF No. 21 at 17 (internal citation omitted).)

Evidence that the defendants knew his disability may prevent Brooks from complying with the one-hour call-in procedure, but took no steps to determine whether

an accommodation might be reasonable, precludes summary judgment in the defendants' favor as to this claim. A reasonable finder of fact could conclude that the defendants failed to reasonably accommodate Brooks's disability by holding him to a policy with which his disability allegedly prevented him from complying.

**Discrimination**

Preliminarily, the court notes that the parties discuss Brooks's ADA disparate treatment and FMLA retaliation claims using the jargon that was commonplace in employment discrimination case law, referring to direct and indirect methods of proof and a "convincing mosaic." (ECF Nos. 17 at 20, 21, 22, 24, 26; 21 at 19, 22.) But these "are just means to consider whether one fact (here, [disability and FMLA leave]) caused another (here, [discipline and] discharge) and therefore are not 'elements'' of any claim." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763 (7th Cir. 2016). They are diversions that have "complicated and sidetracked employment-discrimination litigation for many years." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). They detract attention from the sole question that matters: whether Brooks would have kept his job had he not been disabled or taken FMLA leave and everything else had been the same? *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *see also Freelain v. Vill. of Oak Park*, No. 16-4074, 2018 U.S. App. LEXIS 10975, at *21 (7th Cir. Apr. 30, 2018) (applying *Ortiz* to case involving claims under FMLA and ADA); *Cloutier v. GoJet Airlines, LLC*, No. 16 C 1146, 2018 U.S. Dist. LEXIS 81366, at *28 (N.D. Ill. May 15, 2018) (same) (citing

*Deacon v. Peninsula Chicago, LLC*, No. 16-CV-1464, 2017 U.S. Dist. LEXIS 131252, 2017 WL 3531518, at *9 (N.D. Ill. Aug. 17, 2017)); *Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 956 (N.D. Ill. 2016) (applying *Ortiz* to ADA claim). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself …. [N]o evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). However, when applicable, the familiar *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

Also preliminarily, the defendants contend that Brooks must be able to show that he would not have been fired but for his disability. (ECF No. 17 at 24 (citing *Serwatka v. Rockwell Auto., Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)).) However, *Serwatka* was decided under a prior version of the ADA. "Congress enacted significant amendments to the ADA in 2008. As relevant here, the language prohibiting discrimination "because of" a disability was amended to prohibit discrimination "on the basis of" a disability. *Silk v. Bd. of Trs.*, 795 F.3d 698, 705 (7th Cir. 2015) (quoting 42 U.S.C. § 12112(a)). It remains an open question in this circuit whether this amendment opened the door to mixed motive claims under the ADA. Nonetheless, because Brooks does not argue that anything other than the "but-for" standard applies, the court will apply it here. *See Silk v. Bd. of Trs.*, 795

F.3d 698, 706 (7th Cir. 2015) (continuing to apply the but-for standard in the absence of adequate briefing on the question).

However, with respect to retaliation under the FMLA, Brooks need only establish "that the protected conduct was a substantial or motivating factor in the employer's decision." *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741-42 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)). He need not establish that his discipline and termination would not have occurred but for his use of FMLA leave. *Id.*

In an effort to show that animus with respect to his disability and his use of FMLA leave motivated the defendants in deciding to discipline, and eventually terminate, him, Brooks points to how the defendants treated Barry[1] Debord, another EVS employee who failed to call in or show up for work on Labor Day 2016. Debord was not disciplined until months later, after the EEOC notified Froedtert that Brooks had identified Debord as a similarly situated employee who was treated better than Brooks. (ECF No. 21 at 21; *see also* ECF No. 29, ¶¶ 66, 67.)

The defendants contend that Debord is not similarly situated to Brooks because he did not have a comparable disciplinary history. (ECF No. 27 at 13.) It contends, "Mr. Debord on the other hand had only received a single Written Warning back in February, 2016. Mr. Debord's disciplinary history was very different from Plaintiff's meaning his absence did not subject him to termination." (ECF No. 27 at 14 (internal citation

---

[1] Brooks frequently incorrectly refers to him as Gary.

omitted).) In support, the defendants point to the following statement from *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016): "An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated." (ECF No. 27 at 13 (quoting (without quotation marks) *Simpson*, 827 F.3d at 662).)

However, the court in *Simpson* did not mean that employees must have an identical disciplinary history to be similarly situated. Significantly, *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008), the case cited in *Simpson* in support of the point quoted above, says, "A similarly situated employee need not be 'identical,' but the plaintiff must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008); citing *Crawford v. Ind. Harbor Belt RR. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (holding that a similarly situated employee is one who is "comparable to plaintiff in all material respects").

Brooks is not arguing that because Debord was not fired the court should infer discriminatory animus. There appears to be no dispute that Brooks's and Debord's discipline histories put them at different points with respect to Froedtert's progressive

discipline policy. Brooks is not arguing that Debord should have been fired for missing work on Labor Day 2016 even if he had not incurred four occurrences. Rather, he is arguing merely that Debord should have been disciplined for his identical failure to call in or show up to work that day. The mere fact that Debord may have incurred fewer occurrences than Brooks does not make them dissimilarly situated for purposes of being disciplined under the leave policy. The fact that the defendants did not discipline Debord until contacted by the EEOC suggests that their frustration with Brooks's disability and frequent leave motivated them to discipline him.

This evidence of disparate treatment, combined with other circumstantial evidence, could lead a reasonable finder of fact to conclude that the defendants' decision to discipline Brooks and subsequently terminate his employment was motivated by his taking FMLA leave and would not have occurred but for his disability. There is evidence suggesting that the defendants had grown frustrated with Brooks's tardiness. Although apparently content to look the other way for a while, it got to the point that the defendants felt they had to crack down and ensure he complied with their policies. Therefore, they started to scrutinize Brooks's attendance.

But it soon became apparent that Brooks's tardiness was not a result of personal dereliction that could be corrected with discipline. Brooks would continue to be tardy because of his disability (and his physician certified as much). Thus, Froedtert took a hard line with him. It relied on a generally applicable one-hour-in-advance call-in

policy to discipline him, apparently without regard to whether it interfered with Brooks's rights under the FMLA or whether some modification of the policy might have been a reasonable accommodation under the ADA.

The defendants' hard line scrutiny continued, and what might have been a reasonable misunderstanding as to whether he was required to work on Labor Day was offered as the final straw to terminate Brooks's employment.

**IT IS THEREFORE ORDERED** that Froedtert's motion for summary judgment is **denied**.

Dated at Milwaukee, Wisconsin this 11th day of June, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge